**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

**MICHELLE RUCKER** **PLAINTIFF**

**v.** **Case No. 5:12-cv-00088-KGB**

**JIMMY BANKS, *et al.*** **DEFENDANTS**

**OPINION AND ORDER**

Plaintiff Michelle Rucker brings this action against defendants Jimmy Banks, in his official capacity as Warden of the Varner Unit and in his individual capacity, and the Arkansas Department of Correction (the "ADC"). Ms. Rucker alleges race and gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and 42 U.S.C. § 1983. On December 20, 2013, defendants filed a motion for summary judgment (Dkt. No. 23). Ms. Rucker filed a response (Dkt. No. 36), to which defendants filed a reply (Dkt. No. 40). For the following reasons, defendants' motion for summary judgment is granted in its entirety. Ms. Rucker's race and gender discrimination claims are hereby dismissed with prejudice.

## I. Factual Background

The following facts are undisputed and taken from defendants' statement of facts as to which there is no genuine dispute to be tried (Dkt. No. 25-1) and Ms. Rucker's responses to defendants' statement of facts as to which there is no genuine dispute (Dkt. No. 36-1), unless otherwise specified by citation.

In August 2003, the ADC hired Ms. Rucker as an entry-level correctional officer ("CO-I"). Around 2007, the ADC promoted Ms. Rucker to sergeant, the first supervisory position in

the chain of command. Ms. Rucker only worked as a sergeant at the Varner Supermax Unit; she did not work in the general population Varner Unit.

As a sergeant, Ms. Rucker was responsible for, among other things, being familiar with and following "post orders"—which are "outlines" of the "rules you go by with that particular post"—and ensuring that subordinate officers enforce and adhere to department and unit policies (Dkt. No. 36-1, at 2). Ms. Rucker attended a six-week course at ADC's Training Academy, where she learned how to "deal" with inmates, upon being hired by ADC, and a refresher training course each month thereafter. ADC policies for the Varner Supermax Unit included: that inmates be moved at a ratio of "two officers for every one inmate"; that all gates and doors are secured at all times; that escorting staff maintain physical control over inmates being escorted, such as by maintaining a hand on the inmate's handcuffs; and that inmates be escorted with their hands handcuffed behind their backs.

On January 20, 2012, an inmate named Latavious Johnson, who was serving time at the East Arkansas Regional Unit for first-degree murder, killed a correctional officer named Barbara Ester with an improvised knife or "shank." During the night of January 20, 2012, ADC decided it would transfer inmate Johnson to the Varner Supermax Unit.

At approximately 5:45 p.m., before regularly scheduled shift meetings, Warden Banks held a "pre-meeting" with other high-level officers. Defendants contend that Warden Banks instructed other ranking officers to tell prison staff that everyone must vigilantly follow all post orders to avoid another deadly incident. At approximately 6:00 p.m., Deputy Warden Chris Meinzer met with Varner Supermax officers during their shift meeting. Defendants contend that Deputy Warden Meinzer told the attendees, including Ms. Rucker, to read the post orders and

follow them. Ms. Rucker denies that Warden Banks or Deputy Warden Meinzer instructed personnel that all post orders must be followed (*Id.* at 3-4).

Approximately two hours after the shift meeting, Ms. Rucker was overseeing a shower call in an isolation area when an inmate assaulted George Duncan, a CO-I under Ms. Rucker's direct oversight and supervision. Ms. Rucker and Officer Duncan were each escorting one prisoner. The inmate being escorted by Officer Duncan attacked him with his arms and hands before being subdued with pepper spray. An emergency radio call for help caused numerous correctional officers to respond.

Warden Banks instructed Deputy Warden Meinzer to investigate the incident and report back. Deputy Warden Meinzer viewed surveillance footage of the incident. Ms. Rucker admits that the surveillance footage shows that she committed three different policy violations: (1) she restrained the inmate whom she was escorting with his hands in front of his body, rather than behind his back; (2) she escorted the inmate at a ratio of one officer per inmate, rather than two officers per inmate; (3) and she left gates and doors open. Defendants argue that Ms. Rucker also violated policy by not exercising control over her inmate at all times, such as by placing her hand on the inmate's handcuffs or back, but Ms. Rucker claims that she always had control of her inmate.

Deputy Warden Meinzer also interviewed Officer Duncan about the incident. According to defendants, Officer Duncan claimed that he raised with Ms. Rucker a concern about violating policy and that Ms. Rucker responded to his concern by telling him to restrain the inmate with his hands in front of his body, a violation of policy, because "they were not leaving the isolation area" (*Id.* at 6-7). Ms. Rucker denies instructing Officer Duncan to violate policy. On January 24, 2012, Deputy Warden Meinzer asked Officer Duncan to provide a written witness statement

regarding his claim, which Officer Duncan did. Deputy Warden Meinzer sent a memorandum of his findings and Officer Duncan's witness statement to Warden Banks.

After meeting with Ms. Rucker, Warden Banks terminated her employment. Ms. Rucker filed a grievance appealing Warden Banks's decision to ADC Director Ray Hobbs. After hearing witness testimony and reviewing video evidence, the Internal Review Committee recommended that Warden Banks's decision be upheld. However, Director Hobbs reduced Ms. Rucker's punishment to a 30-day suspension and demotion—albeit noting that "Warden Banks was justified in escalating [Ms. Rucker's] disciplinary action" (Dkt. No. 23-13, at 20). Ms. Rucker returned to work in August 2012. On March 1, 2012, she filed this action.

## II. Legal Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989). However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008). "The evidence of the non-movant is to be believed,

and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (citing *Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010)). "Because summary judgment is not disfavored and is designed for 'every action,' panel statements to the contrary are unauthorized and should not be followed." *Id.*

**III. Discrimination Claims**

Ms. Rucker brings claims of race and gender discrimination against defendants under Title VII and 42 U.S.C. § 1983. To establish her claims, Ms. Rucker can either provide direct evidence of discrimination or create an inference of unlawful discrimination under the three-step analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 953 (8th Cir. 2012). Direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. *Torgerson*, 643 F.3d at 1044 (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)). "Thus, 'direct' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether [her] strong evidence is circumstantial." *Id.* However, "if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, [s]he must avoid summary judgment by creating the requisite

inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext." *Id.*

"To be entitled to direct evidence analysis, the plaintiff must present evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir. 1998) (quoting *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir. 1993) (internal quotation marks omitted)). Because Ms. Rucker has presented no direct evidence of discrimination, the Court will proceed with a *McDonnell Douglas* analysis.

### A. *Prima Facie* Case And Legitimate, Nondiscriminatory Reason

Under the *McDonnell Douglas* analysis, "the plaintiff bears the burden of establishing a *prima facie* case of discrimination." *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 873 (8th Cir. 2007). A plaintiff establishes a *prima facie* case by showing that: (1) she is a member of a protected group; (2) she was meeting the employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees who were not members of the protected group were treated differently. *Philip v. Ford Motor Co.*, 413 F.3d 766, 768 (8th Cir. 2005). If a plaintiff makes out a *prima facie* case, she "creates a presumption of unlawful discrimination, rebuttable through the showing of a legitimate nondiscriminatory reason for the action." *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 990 (8th Cir. 2011). Lastly, a plaintiff "may still demonstrate the employer's proffered reason was pretextual and unlawful discrimination was a motivating factor in the adverse employment decision." *Id.*

The parties do not dispute at the summary judgment stage whether Ms. Rucker can establish a *prima facie* case. Assuming that Ms. Rucker can establish a *prima facie* case of discrimination, the burden shifts to defendants to produce evidence of a legitimate, nondiscriminatory reason for initially terminating, and ultimately suspending and demoting, Ms. Rucker. *Tyler*, 628 F.3d at 990. "This burden is not onerous." *Bone*, 686 F.3d at 954. As legitimate, nondiscriminatory reasons for disciplining Ms. Rucker, defendants explain that she:

> committed a large number of policy violations with regard to her own escorting and security practices; she allowed a less experienced subordinate under her direct supervision to violate Post Orders; the policy violations led to a dangerous incident that included an inmate-on-officer assault; and the violations occurred approximately two hours after Deputy Warden Meinzer told [Ms. Rucker] about Officer Ester's murder and reminded her to follow Post Orders.

(Dkt. No. 24-1, at 21). Ms. Rucker does not dispute at the summary judgment stage that these are legitimate, nondiscriminatory reasons for disciplining her.

### B. Pretext

Because defendants have articulated legitimate, nondiscriminatory reasons to discipline Ms. Rucker, "the presumption of discrimination disappears," and the burden of persuasion shifts back to Ms. Rucker "to prove that the proffered justification is merely a pretext for discrimination." *Bone*, 686 F.3d at 955 (quoting *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1007 (8th Cir. 2005)). "There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext." *Torgerson*, 643 F.3d at 1047. First, "[a] plaintiff may show that the employer's explanation is unworthy of credence . . . because it has no basis in fact. Alternatively, a plaintiff may show pretext by persuading the court that a [prohibited] reason more likely motivated the employer." *Id.* (alterations in original) (citations omitted) (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006)) (internal quotation marks omitted). "A plaintiff may show pretext, among other ways, by showing that an employer (1)

failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).

Ms. Rucker makes three main arguments in her attempt to demonstrate a material question of fact regarding pretext. The Court will consider each of Ms. Rucker's arguments in turn but must first determine whether the Court can consider her submitted affidavits.

**1. Affidavits Submitted By Ms. Rucker**

In support of her arguments, Ms. Rucker submitted her own affidavit and the affidavits of Tanza Nelson and Sharon Jones. Defendants claim that the Court should not consider the affidavits cited by Ms. Rucker because they are inadmissible, conclusory, self-serving, and irrelevant.

An affidavit made in opposition to a motion for summary judgment must be based on personal knowledge, not inadmissible hearsay. Fed. R. Civ. P. 56(c)(4); *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 728 (8th Cir. 2001); *Jenkins v. Winter*, 540 F.3d 742, 748 (8th Cir. 2008) (holding that an affidavit containing inadmissible hearsay "may not be used to support or defeat a motion for summary judgment"). An affidavit also must be based on facts, not conclusory statements. *LaCroix v. Sears, Roebuck & Co.*, 240 F.3d 688, 691 (8th Cir. 2001) (holding that a properly supported motion for summary judgment is not defeated by conclusory statements in an affidavit). Moreover, a plaintiff cannot defeat summary judgment by merely submitting a self-serving affidavit that contradicts earlier, sworn testimony. *Frevert v. Ford Motor Co.*, 614 F.3d 466, 474 (8th Cir. 2010); *Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006) ("[A] properly supported motion for summary judgment is not defeated by self-serving affidavits.").

Defendants argue that Ms. Nelson and Ms. Jones's affidavits are not based on personal knowledge because, according to Warden Banks's affidavit, both women were assigned only to the regular Varner Unit, not the Varner Supermax Unit (Dkt. No. 40-1). Warden Banks's affidavit asserts that the Varner Unit houses general population inmates, while the Varner Supermax Unit houses segregated inmates in six cell blocks and three isolation wings (*Id.*). Defendants contend, and Warden Banks's affidavit confirms, that the post orders admittedly violated by Mr. Rucker apply to the Varner Supermax Unit, not the Varner Unit (*Id.*). Ms. Rucker filed nothing to oppose defendants' assertions, but the Court notes that Ms. Nelson and Ms. Jones's affidavits make clear they are based on a review of documents produced by the ADC in cases filed against the ADC, on their own personal observations, and based on what they saw (Dkt. Nos. 36-3, 36-4). Further, both Ms. Nelson and Ms. Jones confirm they worked for Warden Banks (*Id.*). For these reasons, the Court will not discount the affidavits on the basis of what the Court considers a hearsay objection.

Defendants also argue that Ms. Nelson and Ms. Jones's affidavits are conclusory. The Court agrees in part and disagrees in part. Part of the affidavits may be conclusory, such as Ms. Nelson and Ms. Jones's allegations that they were treated differently based on race (*See, e.g.*, Dkt. No. 36-5 ("I was terminated . . . under circumstances similarly situated whites or males were not.")). *See Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1015 (8th Cir. 2012) (holding that allegations of being a victim of discrimination or being treated differently based on race or gender are conclusory). The Court determines, however, that both affidavits also contain information that is not conclusory. The Court will consider such information.

As for Ms. Rucker's affidavit, defendants argue that it is self-serving and inconsistent with her earlier, sworn testimony. Specifically, Ms. Rucker's affidavit asserts that "following all

post orders vigilantly was not discussed" in the pre-meeting and shift meeting (Dkt. No. 36-2, at 1). Defendants argue that this statement is inconsistent with Ms. Rucker's deposition testimony that "I don't recall [it] being discussed. It's just something that we put [in the shift meeting briefing summary]" (Dkt. No. 23-10, at 9). Ms. Rucker's affidavit also asserts that post orders were routinely violated while escorting inmates, but defendants argue this is inconsistent without pointing to prior, sworn testimony contradicting it. The Court determines that Ms. Rucker's affidavit is not clearly inconsistent with her earlier, sworn testimony and will consider Ms. Rucker's affidavit with the understanding that a self-serving affidavit, even if consistent, cannot alone defeat a properly supported motion for summary judgment. *See Conolly*, 457 F.3d at 876.

In sum, the Court can and will consider all but the conclusory portions of the affidavits.

**2. Warden Banks's Alleged Failure To Follow ADC Policy**

To establish pretext, Ms. Rucker argues that Warden Banks violated ADC policy when he terminated her. She claims that Warden Banks's actions "were obviously in violation of policy and evidence of pretext" because, following an agency grievance hearing, Director Hobbs reduced the discipline to a suspension and demotion (Dkt. No. 37, at 2).

Ms. Rucker's conclusory allegation that Warden Banks violated ADC policy is unfounded and does not establish pretext. There is no factual support for the allegation in the record. The Internal Review Committee upheld Warden Banks's determination (Dkt. No. 23-13, at 17), and Director Hobbs reduced Ms. Rucker's termination to a suspension and demotion only after stating that "Warden Banks was justified in escalating [her] disciplinary action" (*Id.* at 20).

**3. Comparators**

Ms. Rucker also offers comparators, who she claims were similarly situated but treated differently, as evidence of pretext. "At the pretext stage, the test for determining whether

employees are similarly situated to a plaintiff is a rigorous one." *Bone*, 686 F.3d at 956 (quoting *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005)) (internal quotation marks omitted). "The similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone." *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013) (quoting *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010)) (internal quotation marks omitted). A plaintiff "must show that she and the employees outside of her protected group were similarly situated in all relevant respects." *Bone*, 686 F.3d at 956 (quoting *Rodgers*, 417 F.3d at 853) (internal quotation marks omitted). The potential comparators "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* (quoting *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000)). Further, "[t]o be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness." *Id.* (alteration in original) (quoting *Rodgers*, 417 F.3d at 853) (internal quotation marks omitted). "Where evidence demonstrates that a comparator engaged in acts of 'comparable seriousness' but was disciplined differently, a factfinder may decide whether the differential treatment is attributable to discrimination or some other cause." *Ridout*, 716 F.3d at 1085.

Ms. Rucker offers six comparators: Officer Duncan, an African American male; Officer Frankie Brooks, a Caucasian male; Officer Bradley Trantham, a Caucasian male; Officer Orlando Davis, an African American male; and Lt. Antoine Emsweller and Lt. Roderick Johnson, African American males. Because Officer Duncan, Officer Davis, Lt. Emsweller, and Lt. Johnson are African Americans, even if similarly situated they can only be offered in support of Ms. Rucker's gender discrimination claim.

Defendants make many arguments as to why Ms. Rucker's offered comparators are not similarly situated. The Court credits three of these arguments that, when taken together, distinguish all of the comparators offered by Ms. Rucker.

First, defendants argue that Officer Brooks, Officer Trantham, Officer Davis, and Officer Duncan are not similarly situated because they held the entry-level, non-supervisory rank of "C.O." at the time of the incidents in which they were involved, whereas Ms. Rucker held the rank of sergeant and had nearly eight years of experience. The Court agrees. Employees holding different job titles and responsibilities, and who are subject to different standards, are not similarly situated. *See Bone*, 686 F.3d at 956 (explaining that potential comparators "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances"); *Curtis v. Ark. State Plant Bd.*, No. 4:11-cv-195 KGB, 2013 WL 3753980, at *9-10 (E.D. Ark. July 15, 2013); *Johnson v. Baltimore Cnty.*, No. WMN-08-CV-3162, 2010 WL 2545761, *3 (D. Md. June 16, 2010) ("As Plaintiff was a Lieutenant, the Court cannot compare the standards of performance expected of her versus standards expected of mere correctional officers."); *cf. EEOC v. Trans State Airlines*, 562 F.3d 987, 993 (8th Cir. 2006) (finding that employees on probation are not similarly situated to employees not on probation because they were subject to different disciplinary standards and were afforded different rights). Although Ms. Rucker claims that post orders do not make a distinction between supervisory and non-supervisory ranks, her duties were different by her own admission (*See* Dkt. No. 36-1, at 1-2).[1] Specifically, as a supervisor, a sergeant must ensure that subordinate officers enforce and adhere to department and unit policies (*Id.*; Dkt. No. 23-1, at 5

[1] To reach this determination, the Court need not and does not credit defendants' reply, in which defendants contend Ms. Rucker as a sergeant was required to implement and follow both the post orders for regular officers and separate post orders for sergeants (Dkt. No. 40, at 11).

("I was responsible for my subordinates, yes.")). In fact, Ms. Rucker was accused of and in part disciplined for violating this policy, as she allegedly instructed a subordinate—Officer Duncan—not to enforce or adhere to department and unit policies. Non-supervisory comparators cannot be subject to this standard and thus cannot be similarly situated.

Second, defendants argue that Lt. Emsweller and Lt. Johnson are not similarly situated because there is no evidence that defendants knew or believed that Lt. Emsweller and Lt. Johnson committed any policy violations (Dkt. No. 24-1, at 47). The Court agrees, and while Ms. Rucker claims that defendants knew that such violations were common, she admits that she does not know if defendants were aware of Lt. Emsweller and Lt. Johnson's specific violations. *See Bone*, 686 F.3d at 957 (holding that comparators were not similarly situated in part because plaintiff "introduced no evidence that [the employer-defendant] believed [comparators] committed the alleged disciplinary violation"); *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (holding that comparators were not similarly situated because there was no evidence that the persons who decided to terminate plaintiff "had any idea that other workers were also away without authorization during the workday"). In fact, the only reason Ms. Rucker is aware of Lt. Emsweller and Lt. Johnson's violations is that, to mount a defense to the anticipated adverse employment action she thought would be taken against her after the incident with Officer Duncan, she reviewed video surveillance footage to scan for policy violations of others (Dkt. No. 24-1, at 43).

Third, defendants argue that all comparators are distinguished because defendants only had reason to believe that Ms. Rucker instructed a subordinate—Officer Duncan—to violate the post orders. The Court agrees. A supervisor actively encouraging subordinates to violate policy is not of comparable seriousness to simply violating a policy yourself, even if doing so sets a bad

example for others. *See Williams v. Ford Motor Co.*, 14 F.3d 1305, 1309 (8th Cir. 1994) ("In determining whether the employees are 'similarly situated' for purposes of establishing a prima facie case we consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."). Although Ms. Rucker's affidavit denies instructing Officer Duncan to violate the post orders and even that Officer Duncan reported that she so instructed (Dkt. No. 36-2, at 1), her denials do not adequately refute that defendants honestly believed that she gave the instruction. *See, e.g.*, *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (8th Cir. 2012) ("[E]ven if the business decision was ill-considered or unreasonable, provided that the decisionmaker honestly believed the nondiscriminatory reason he gave for the action, pretext does not exist."); *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006) ("A proffered legitimate, non-discriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination."); *see also Conolly*, 457 F.3d at 876 ("[A] properly supported motion for summary judgment is not defeated by self-serving affidavits."). Moreover, though Ms. Nelson claims in her affidavit that "Warden Banks, when he receives a statement that does not support his position, instructs officers to redo the statement" and provides specific instances of this allegedly occurring (Dkt. No. 36-5), she does not claim in her affidavit that Warden Banks so instructed Officer Duncan. Further, the parties agree that Deputy Warden Meinzer, not Warden Banks, obtained Officer Duncan's oral and written statement here (Dkt. No. 36-1, 6-7).

Although the above arguments sufficiently distinguish all of Ms. Rucker's comparators, defendants make at least three additional arguments that the Court does not credit. Defendants argue that Lt. Emsweller and Lt. Johnson are not similarly situated because their "alleged policy violations did not coincide with any sort of inmate attack, assault, or reportable incident" (Dkt.

No. 24-1, at 44). Other federal courts have found that the immediate consequences of policy violations can determine whether they are of comparable seriousness, *see*, *e.g.*, *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 711 (6th Cir. 2006); *White v. Mabus*, 837 F. Supp. 2d 1127, 1136 (S.D. Cal. 2011); *Norris v. Metro-North Commuter RR Co.*, 522 F. Supp. 2d 402, 410 (D. Conn. 2007), but the Eighth Circuit does not appear to have done so. Defendants also argue that Officer Brooks, Officer Trantham, Officer Davis, and Officer Duncan are not similarly situated because each was accused of at most one policy violation per incident, whereas Ms. Rucker was accused of multiple policy violations during one incident. However, Ms. Rucker disputes that these officers only committed one policy violation per incident, specifically stating that they handcuffed inmates in front while escorting inmates at a one-to-one ratio. Defendants lastly argue that Officer Brooks, Officer Trantham, Officer Davis, Officer Emsweller, and Officer Johnson are not similarly situated because their policy violations occurred at "meaningfully different times." But this argument focuses on Deputy Warden Meinzer's instruction to follow post orders, an instruction that Ms. Rucker disputes.

**4. Alleged Inconsistency With Typical Policy And Practice**

Ms. Rucker lastly contends that, although she committed policy violations, the policies in question were violated routinely without punishment, as alleged in her submitted affidavits. The Court acknowledges that defendants urge the Court to discount the affidavits submitted in support of this contention, but the Court has opted to consider them. Ms. Rucker argues that her record evidence that the policies in question were violated routinely without punishment establishes pretext, even without similarly situated comparators, because defendants, by punishing her, acted inconsistently with their typical policy and practice. Ms. Rucker cites three Eighth Circuit cases in support of her argument. *See Eliserio v. United Steelworkers of Am.*

*Local 310*, 398 F.3d 1071 (8th Cir. 2005); *Ridout*, 716 F.3d 1079; *Landon v. Nw. Airlines, Inc.*, 72 F.3d 620 (8th Cir. 1995).

Even if the Court credits Ms. Rucker's evidence that the policies Ms. Rucker violated were routinely violated by other officers without punishment, the Court determines that this alone, under the circumstances, would not allow a reasonable juror to find pretext. *See Torgerson*, 643 F.3d at 1047. An examination of the Eighth Circuit cases cited by Ms. Rucker is instructive. In *Eliserio*, the Eighth Circuit held that plaintiff had established pretext because defendant "admitted that no other employee had been disciplined for [violating the policy in question] . . . in the previous eight years." *Eliserio*, 398 F.3d at 1080. However, the Court prefaced this reasoning on the fact that defendant could not explain why it "suddenly took the severe step of demoting" plaintiff for a policy violation that it had previously considered "so insignificant that it did not even bother to inform [plaintiff] of a problem." *Id.*

Similarly, in *Ridout*, the Eighth Circuit held that plaintiff had established pretext in part because of evidence that defendant's "decision to terminate him . . . was not typical of [defendant's] policy or practice," as none of the supervisors "could recall a single other instance where any employee had been terminated" for the same policy violations. *Ridout*, 716 F.3d at 1084. But there also was other evidence of pretext—such as similarly situated comparators who were treated more leniently. *Id.* at 1086. The Eighth Circuit concluded that plaintiff's evidence "[*t*]*aken together*" was sufficient to show pretext. *Id.* (emphasis added). The court did not decide whether plaintiff's evidence that defendant's actions were not typical of its policy or practice could have established pretext *alone*. Those facts were not presented to the court. Further, as in *Eliserio*, the defendant in *Ridout* failed to explain its allegedly inconsistent actions.

Likewise, in *Landon*, the Eighth Circuit found that evidence that defendant acted inconsistently with its proffered reason, along with a variety of other evidence showing pretext, was sufficient for a reasonable juror to reject the proffered reason, but the court did not determine whether the evidence of inconsistency alone could establish pretext. *Landon*, 72 F.3d at 625. Again, in *Landon*, defendant offered no explanation for the alleged inconsistency in its actions.

Here, defendants offer an explanation for the alleged inconsistent discipline that does not depend on race or gender: Ms. Rucker's policy violations occurred shortly after the death of Officer Ester. Whether or not following all post orders vigilantly was discussed in the pre-meeting and shift meeting, a fact Ms. Rucker disputes, defendants had a legitimate, non-discriminatory reason to enforce policies more strictly at the time of Ms. Rucker's violations. Though perhaps unfair that Ms. Rucker's violations occurred at a time of increased sensitivity for such violations on the part of defendants, especially if no warning of stricter enforcement was given as Ms. Rucker contends, this Court does not sit as "[a] super-personnel department, reviewing the wisdom or fairness of the business judgments made by employers." *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 883 (8th Cir. 2005).

The Court notes that it has not limited Ms. Rucker's more specific comparator evidence to those who committed policy violations after a murder of a correctional officer, despite defendants' request that it do so. There are many ways a comparator's violations could be of comparable seriousness without sharing the exact circumstances, but none of the comparators offered by Ms. Rucker are similarly situated for the reasons stated above. Because of this and because defendants can explain Ms. Rucker's allegation of inconsistent discipline consistent with their legitimate, nondiscriminatory reasons, this Court determines that a reasonable juror could

not conclude that defendants' proffered justification is merely a pretext for race or gender discrimination. *Torgerson*, 643 F.3d at 1047. Ms. Rucker has not demonstrated a genuine dispute of material fact regarding whether race or gender motivated defendants' actions.

**IV. Qualified Immunity**

A government official sued in his individual capacity may raise the defense of qualified immunity. The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stepnes v. Ritschel*, 663 F.3d 952, 960 (8th Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)) (internal quotation marks omitted). To determine if a qualified immunity defense applies, the Court must conduct a two-prong inquiry by examining: "(1) whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right and (2) whether the constitutional right violated was clearly established at the time of defendant's alleged misconduct." *Id.* (alteration in original) (internal quotation marks omitted). "Unless the answer to both of these questions is yes, the defendants are entitled to qualified immunity." *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009).

For the reasons discussed above, the facts alleged, taken as true and viewed in the light most favorable to Ms. Rucker, do not show that Warden Banks violated her constitutional rights. Thus, because the answer to the first prong of the qualified immunity analysis is no, Warden Banks is entitled to qualified immunity.

* * *

In sum, defendants' motion for summary judgment is granted in its entirety, and Ms. Rucker's race and gender discrimination claims are hereby dismissed with prejudice.

SO ORDERED this 10th day of February, 2014.

KRISTINE G. BAKER
UNITED STATES DISTRICT JUDGE